**ATLANTIC PIPE LINE CO. v. BROWN COUNTY et al.**

No. 206.

District Court, N. D. Texas, San Angelo Division.

Nov. 9, 1935.

Charles I. Francis and Vinson, Elkins, Sweeton & Weems, all of Houston, Tex., Harry C. Weeks and Weeks & Morrow, all of Wichita Falls, Tex., and T. R. Freeman, of Dallas, Tex., for complainant.

H. Grady Chandler, W. N. Sands, and M. E. Lathan, Asst. Attys. Gen., and Conner Scott, Co. Atty., Brown county, of Brownwood, Tex., for respondents.

ATWELL, District Judge.

After the granting of a temporary injunction in the spring of 1935, upon representation of the parties, a commissioner to take testimony was appointed. That officer took approximately 3,800 pages. During the taking, there were objections offered occasionally by each side, but usually the party proposing the testimony went forward and the objection and testimony both passed into the record. Upon the conclusion of the testimony taking, amended pleadings were filed. We have spent approximately four days in the trial of the case. The complainant waived such objections as it may have made to the testimony. The respondents have waived a portion of their objections, but desire to preserve certain others, and in so far as the others relate to certain hearsay testimony, they are sustained.

The complainant is a Maine corporation, with a permit to do business in Texas. It complains of Brown county, the county judge, the county commissioners, the county attorney, the tax assessor and collector. It claims that it owns and operates four pipe lines; three of which are entirely within Texas and the other of which is partly within Texas and partly within the state of New Mexico; they are known, respectively, as the West Texas line, the East Texas line, the Refugio line, and the Barbers Hill line. The first is approximately 680 miles in length, with one branch of it originating in New Mexico, a short distance from the Texas line. This branch extends from that point in New Mexico for 79 miles and connects with another branch which originates in Ward and Winkler counties, and from that junction extends southeasterly across the state, through Brown county to Jefferson county, where it terminates in tank and loading facilities. About 2 per cent. of this line is outside of the state of Texas. The East Texas line originates in Upshur county, running in a generally southern direction to Jefferson county, where it also terminates and is 190 miles in length. The Refugio line originates in Bee county, Tex., extends into Nueces county to certain loading facilities, and is 38 miles long. The Barbers Hill line is born in Chambers county, runs to the coast, terminating in shipping and loading facilities, and is 12 miles long.

The terminii of these four lines are adjacent to and upon the waters of the Gulf of Mexico or its tributaries, bays, and harbors, where there are appliances for loading the oil in vessels for transportation. Each line has pumping stations, storage tanks, telephone and telegraph lines, and the general equipment used in such business. Each line is separately and independently equipped and operates in separate and independent fields, and there is no physical connection between them, save and except that both West and East Texas lines terminate at Atreco.

It is not a producer, nor a purchaser of oil; its business is solely that of transporting oil for others. Ninety-eight per cent. of such freight so carried is interstate commerce.

The Atlantic Oil Producing Company is a Delaware corporation engaged in producing oil in various fields of Texas and elsewhere; the Atlantic Petroleum Purchasing Corporation is chartered under

the laws of Maryland for the business of buying and selling crude oil; both companies have permits to do business in Texas. The capital stock of the complainant and of the Atlantic Petroleum Purchasing Corporation is owned by the Atlantic Company, which does no business in Texas, and is a citizen of Maine. The entire capital stock of the Atlantic Company is owned by the Atlantic Refining Company, a Pennsylvania corporation, and does no business in Texas.

The complainant has no funded nor bonded debt. Its shares are owned by the Atlantic Company. The Atlantic Refining Company has shares of stock and bonds listed on the stock exchanges and is dealt in by the public.

The West Texas line began operation in 1928; the East Texas line in 1931; the Barbers Hill line in 1932; and the Refugio line in 1931. Each has been operated continuously since that time. Ninety-seven per cent. of the oil transported by the complainant was produced by the Atlantic Oil Producing Company and purchased by the Atlantic Petroleum Purchasing Corporation, and more than 80 per cent. of the oil transported by complainant was delivered to the Atlantic Refining Company. It has no contract which entitles it to this business with the said Atlantic concerns, nor with any other person or concern, and it has no control of any of the other companies mentioned herein. It has no exclusive franchise for the transportation of oil in Texas or elsewhere, and no assurance of any continuity of its present business. Such business is enjoyed by the grace of the companies named and could not be sold or disposed of. It could not insure any purchaser of its properties or stock, that such purchaser would continue to receive the business of the mentioned companies. The four lines cost $20,523,058.36; the West Texas line $11,832,895.58; the East Texas line $4,097,175.71; the Refugio line $3,478,001.75; the Barbers Hill line $1,114,985.22. These lines had depreciated, January 1, 1934, in the aggregate sum of $9,277,585.67; West Texas line $6,199,154.91; East Texas line $1,790,024.68; Refugio line $977,763.57; Barbers Hill line $410,642.41. These lines extend through forty-four counties, one of which is Brown. In that county there are approximately 23 59/100 miles of pipe line, a pumping station, and other related property, which complainant alleges to be worth, on January 1, 1934, $151,240.

That in 1934 the complainant rendered said property to the Brown county officers for $80,620 which was raised by them to the sum of $88,460, and placed upon the rolls at that figure. That at that time it was the custom and system in Brown county to value property for state and county ad valorem taxes at approximately 50 per cent. of its market value, and that "very large quantities of property taxable in said county were intentionally and systematically omitted from the tax rolls, and not assessed or taxed at all."

That Texas has a state tax board composed of the tax commissioner, the comptroller, and the secretary of state. That board notified complainant to file with it certain reports showing its properties, their cost; its assets and liabilities, its earnings and expenses, and various other data for use by it in compiling figures for intangible asset assessment under the statute of 1925, as amended in 1933 by the Forty-Third Legislature (Rev. St. 1925, art. 7105, as amended by Acts 1933, c. 162, § 12 [Vernon's Ann. Civ. St. art. 7105 and note]). That it submitted to the board such data and that thereafter on May 28, 1934, it was notified that the board had valued its intangible assets and property within Texas at the figure of $8,010,677.00. That the basis chosen by the board was to reduce all of the lines of the complainant of whatever size or dimension to "the equivalent of eight inches." It was then permitted to appear before the board and submit testimony, but the board refused to enlighten it as to the method it was following in arriving at its valuation of complainant's property, nor of any of the factors entering into the same. That the complainant registered objections, both as to the validity of the statute, and to the methods of the board, and contended that it had no intangible property of value. That thereafter on August 11, 1934, the board fixed the value of the "franchise and intangible properties, owned and held subject to taxation within the state of Texas, by complainant, on the first of January, 1934, at the sum of $6,620,200.00." It was also notified that the board had "ascertained, determined, and equalized" the franchise and the tangible properties at that figure, and had apportioned the same

among the various counties through which the complainant's lines run. These figures were certified to the taxing authorities of the various forty-four counties, arrived at as set forth, which resulted in an intangible tax valuation in Brown county of $161,720, which, together with the $88,460, made a total assessment fixed by the respondent against the complainant in that county of $250,180. On this the respondents demanded $5,103.70 tax. Appropriate allegations were made showing the result of the failure to pay.

It claims that the tax fixed by the board is illegal, because discriminatory; that the act under which the board worked is unconstitutional; that respondents intentionally, systematically, and continuously failed to tax similar property; that it is a burden upon interstate commerce; that the valuation arrived at by the board was arbitrary; that it was exercising a legislative function; that the method used in computing was erroneous; and that the proceedings were in violation of the provisions of the State and Federal Constitutions.

The respondents admitted the amount of assessment, the relation of the complainant with certain other Atlantic named industries, but denied any discrimination, illegality, or unconstitutionality. They admitted that it had become more or less a custom in Texas to put property on the tax roll at less than its full, true value, but that equality and uniformity had been observed and that complainant was given a full, ample hearing. That the complainant stated under oath that it could not give the full value of intangible properties, nor the value of its stocks and bonds, and that it was, therefore, necessary for the board to figure out and follow some just and equitable method other than that known as the stock and bond method, and then apportion its findings among the counties through which the complainant's lines passed. That there was and is no substantial injury to complainant or its properties since the board considered several methods of calculation in its efforts to arrive at the true value of the complainant's intangible assets and properties. That it took into consideration the life of the field, estimates of productivity, annual income, future income and outgo, after which it found the value of complainant's property to be $13,792,080 for tax purposes, and it took 48 per cent. of this, which is the amount certified, to wit, $6,620,200. That this valuation is neither unequal, arbitrary, nor discriminatory.

The pleadings are lengthy, but this recital will disclose the importance of the controversy.

After a lengthy trial and a full argument, I think the facts disclose that:

(a) The $88,460 fixed by the respondents as the tangible tax in Brown county is substantially fair. It was arrived at by reason of an agreement or understanding between the commissioner's court and the representative of the complainant, as well as a consideration of the actual value in the light of the same elements and discounts that were allowed to other taxpayers in that county. The commissioner's court, which was composed of the county judge, and the county commissioners, instructed the tax assessor to assess property at approximately 50 per cent. of its value, and the testimony does not support any discrimination against the complainant in that county.

Each side sought to support its theory by substantially the same witnesses; the one upon direct examination, and the other by thoughtful cross-examining.

(b) The intangible asset of the Brown county taxpayer figured only slightly in determining the value of his property. A number of industries were functioning there, and outside of one or two there is no testimony tending to indicate the including of that element of value in the property. It may be conceded that the witnesses in general words left the impression that the assessing officers and the equalization boards were endeavoring to get all property at about one-half of its value, but I think that no one can seriously claim that there was any effort made or any thought given to the securing of any estimate or assessment of or against anything other than that which is known as physical.

(c) The tax board endeavored to perform the function delegated to it by the act of the Legislature, in a fair, impartial, just manner, and had no thought of nor evidenced any discrimination.

(d) When the tax board certified to Brown county, the intangible against the complainant, there resulted against it an item of value upon which it was re-

quired to pay a tax which was not assessed against the other taxpayers, that is, the respondents had not made a like investigation of, nor taken into consideration similar values as to intangible liability of other Brown county taxpayers.

■ (e) The tax board used its own method of apportionment. What it did was not subject to change by the respondents. If the respondents had thought that the two charges against complainant were excessive, it had no authority to change the one made by the board.

(f) The act of the Legislature, vesting the board with the power to inquire into and fix the intangible tax of pipe lines, and apportion the same, gave that board the power to fix both amount and situs.

Findings (a) and (b) above are against the contentions of the complainant in so far as those findings relate to the discrimination on tangible values. The findings (d), (e), and (f) tend to support some of the allegations of fact of the complainant as to the discrimination, lack of equalization, and situs of intangibles; (c) merely means the board did what the statute told it to do as to pipe lines and no other citizen.

Many of the contentions that the complainant makes as to the law have been ruled against it by the Supreme Court of Texas in Missouri, K. & T. R. Co. v. Shannon, 100 Tex. 379, 100 S. W. 138, 143, 10 L. R. A. (N. S.) 681; Lively v. Missouri, K. & T. Railway Co., 102 Tex. 545, 120 S. W. 852; Great Southern Life Insurance Co. v. Austin, 112 Tex. 1, 243 S. W. 778. Also, see, Baker v. Druesedow, 263 U. S. 137, 44 S. Ct. 40, 68 L. Ed. 212; Atlantic Pipe Line Co. v. State Tax Board, 12 F. Supp. 265, a three judge case sitting in the Western District of Texas.

But as to the complaint that there is a discrimination against it in assessment, see Ex parte Williams, 277 U. S. 267, 268, 48 S. Ct. 523, 72 L. Ed. 877, Phillips Petroleum Co. v. Townsend (C. C. A.) 63 F.(2d) 293, there has been no former adjudication. This is the first time it has presented testimony tending to support this charge. This is its only day in court.

■ Discrimination is synonymed with distinction. It is the antithesis of fairness. It means, in this case, the demand from the complainant of a higher rate, or of a higher value, and this disadvantage involves a correlative discrimination. Taxation must be uniform and without such favoritism.

In Cumberland Coal Co. v. Board, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146, it was said that discrimination in state ad valorem taxation, resulting from intentional, systematic undervaluation of some property as compared with the valuation of other property of the same class in other ownership, violates the equal protection clause of the Fourteenth Amendment, even though the property so discriminated against be not assessed higher than its fair market value, or higher than a percentage of fair market value adopted as a uniform basis in making the assessment. To attempt to excuse what was done in this case by acknowledging the fairness of the board in what it did to fix the value of an intangible where it considered millions of income, perhaps and perhaps not depreciation, consolidation instead of separateness of the four lines involved and what not, is to confuse by a partial evil or partial good and be blinded as to the facts. The fact is that after having engaged in various compilations in which thirty-five to forty-eight millions in value were fixed as overalls, and then in which certain deductions were made in order to either offset or compare with 27 per cent. reduction to other pipe line companies, it certified out, as the basis of assessment, $6,620,000, which resulted in an intangible assessment for the county in question of $161,720. The equalization board and county commissioner's court of Brown county were not permitted to disturb this finding. The statute denies them such power. Respondents contend that they could have equalized, had they thought that this intangible value, plus the tangible value which they had found, was too great, in comparison with assessments made against other Brown county taxpayers, by reducing what they had found as to the tangible value. That argument is faulty for the simple reason that the Brown county equalizers could not equalize when they did not know the figures and values that the board had used in reaching that portion of a value. That is intentional which one does with knowledge of the facts. The complainant was pressing the board for opportunity to be heard and in objection

to what it was doing. The board went forward with its work and then, as the testimony shows, quickly sent out the results.

We must bear in mind that the intangible—that part which was valued by the state board—is incapable of being perceived by a sense of touch. It had accumulated all of the data there that it thought satisfactory and sufficient upon which to work. So far as the testimony shows, none of that data was transmitted by it to the equalizing authorities of Brown county. One of the enigmas of tax fixing in Texas, at present, is this division of authority for fixing the value of an entity by fixing the value of its parts without furnishing to the ultimate judges who are to make such found values equalize with the found values of other taxpayers, any of the material that was used by the workmen in that highly important task.

That being the state of the law may not be ground for judicial criticism, since the making of laws is for another department of our government, but it is ground for the judicial discovery of the impossible. With that situation present, the Brown county equalizer had no basis upon which to act.

Greene v. Louisville & I. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88, may be read with profit.

It is unnecessary to consider the question of the performance of a legislative function by the board. Nor is it imperative to a decision of this case that the constitutional provision with reference to the situs of property and its fixing, under certain circumstances, by the Legislature, be again squared with what the board did with the four lines in this case and its reduction to the common denominator of 8-inch pipe as well as other matters.

The 1933 act under which the board functions was evidently framed so as to reach all taxpayers who happened to be pipe lines. The act does concern itself with railroads and some inconsequential public facilities that I am not overlooking. The authority given the board to reach a fair and just valuation for pipe lines may hardly be called an equalization within the meaning of the fundamental law of the state. Neither is there any such saving clause as to pipe lines

as there was as to railroads concerning the apportionment to counties through which the line happened to lay. That phrase as to railroads has been called a fixing of the situs. That, probably, must be done under the law of this state by the Legislature. In these two respects, it seems to me that the Texas cases that I have cited above do not seem to speak. I do not find a satisfactory decision by the highest court of the state on the deeply important question of equalization and situs, but since the case may be decided without questioning its constitutionality, in a definite way, nothing more need be said.

■ I believe the case is ruled by the doctrine of discrimination in assessment. And I think the facts justify the finding and support the conclusion that the respondent should be permanently enjoined from any attempt to collect on the $161,-720. As to the $88,460, judgment may be entered for the respondents.